# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

CANDI OLSON,

          Claimant,

vs.

ANDREW M. SAUL,
Commissioner of Social Security,[1]

          Commissioner.

No. 18-CV-4053-LTS

**REPORT AND RECOMMENDATION**

_____

Plaintiff, Candi Olson ("Claimant"), seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I. BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 13) and only summarize the pertinent facts here. This is an appeal from a denial of disability insurance benefits ("DIB"). Claimant was born on December 28, 1970. (AR[2] at 162.) Claimant has a high school education. (*Id*. at 199.) Claimant allegedly became disabled

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] "AR" cites refer to pages in the Administrative Record.

due to fibromyalgia, chronic back and joint pain, arthritis, degenerative disc disease, depression, and anxiety. (*Id.* at 198.) The alleged onset of disability date was July 1, 2012 (*Id.* at 162). Claimant filed an application for Social Security disability on February 11, 2015. (*Id.*) Claimant was initially denied benefits on June 9, 2015. (*Id.* at 54-67.) Claimant filed for reconsideration on June 2, 2015 and the reconsideration was denied on July 30, 2015. (*Id.* at 95, 68-83.) Claimant filed a Request for Hearing on September 3, 2015. (*Id.* at 105-06.) On May 16, 2017, a video hearing was held with Administrative Law Judge ("ALJ") Jan E. Dutton and Vocational Expert ("VE") Stephen Schill in Omaha, Nebraska and Claimant and her then-counsel Sarah Eyberg[3] in Sioux City, Iowa. (*Id.* at 31-52.) Claimant and the VE both testified. (*Id.* at 37-51.)

The ALJ entered an unfavorable decision on August 22, 2017. (*Id.* at 7-25.) On September 9, 2017, Claimant filed a Request for the Appeals Council to review the ALJ's decision. (*Id.* at 161.) The Appeals Council found there was no basis to review the ALJ's decision on June 4, 2018. (*Id.* at 1-3.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On July 2, 2018, Claimant timely filed her complaint in this Court. (Doc. 3.) All briefs were filed by January 10, 2019. On January 11, 2019, the Honorable Leonard T. Strand, Chief United States District Court Judge, referred the case to me for a Report and Recommendation.

## II.   DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

---

[3] Ms. Eyberg's name is spelled "Iberg" in the transcript of the hearing, but is spelled "Eyberg" in the ALJ's decision. "Eyberg" is the correct spelling. (AR at 158.)

not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996)); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not

severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it.

20 C.F.R. § 416.960(b)(1).  If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled.  *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2).  The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy.  *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.    *The ALJ'S Findings*

The ALJ made the following findings at each step regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since July 1, 2012, her alleged onset date.  (AR at 12.)

At step two, the ALJ found that Claimant had the following severe impairments: degenerative disc disease, fibromyalgia, obesity, and history of bilateral carpal tunnel release surgeries.  (*Id.*)  The ALJ also found that Claimant had the following nonsevere impairments:  hypothyroidism, anxiety, depression, and patellofemoral syndrome of the right knee.  (*Id.* at 13.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations.  (*Id.* at 14.)  Specifically, the ALJ considered listings 1.04 (disorders of the spine resulting in compromise of a nerve root or the spinal cord) and, as a way to evaluate carpel tunnel syndrome, 11.14 (peripheral neuropathies).  (*Id.* at 15.)  The ALJ also opined that while there are no listing criteria for obesity impairments, obesity may have an adverse impact on other coexisting impairments.  (*Id.* at 14.)  Thus, thee ALJ considered the effects of Claimant's obesity when evaluating steps 2 through 5

of the 5 step process.  (*Id.* at 15.)  The ALJ also noted that because fibromyalgia is not a listed impairment, it must be determined whether it medically equals a listing such as 14.09 for inflammatory arthritis or whether it medically equals a listing in combination with at least one other medically determinable impairment.  (*Id.*)  The ALJ concluded that Claimant's fibromyalgia did not equal a listing.  (*Id.*)

At step four, the ALJ found that Claimant had the RFC to perform sedentary work with the following restrictions:

> [Claimant could] stand or walk two hours per eight-hour workday; sit six hours per eight-hour workday; never climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, or crouch; never crawl on hands and knees; can use her hands for frequent but not constant handling, fingering, and  should avoid concentrated exposure to cold, vibrating equipment, and fumes (although she is a cigarette smoker).

(*Id.*)  The ALJ also found that Claimant was not capable of performing past relevant work as a pharmacy technician, cashier, or nurse's aide.  (*Id.* at 23.)

At step five, the ALJ found in the alternative that there were other jobs that existed in significant numbers in the national economy that Claimant could also perform, including addresser, document preparer, and polisher of eye frames.  (*Id.* at 24.)  Therefore, the ALJ concluded that Claimant was not disabled.  (*Id.* at 25.)

**B.    *The Substantial Evidence Standard***

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole."  *Moore*, 572 F.3d at 522.  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citation omitted).  The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted).  The decision

is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## C. *Duty to Develop the Record*

The administrative hearing is a non-adversarial proceeding, and the ALJ has a duty to "fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Because the ALJ has no interest in denying Social Security benefits, the ALJ must act neutrally in developing the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971)); *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994) (opining that "[t]he goals of the [ALJ] and the advocates should be the same: that deserving claimants who apply for benefits receive justice") (quoting *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988)) (bracketed information added) .

## III.   DISCUSSION

Claimant alleges the ALJ committed reversible error by (1) improperly evaluating the opinion of Claimant's treating physician, Dr. Kahl; (2) improperly evaluating

Claimant's subjective complaints and failing to give Claimant the opportunity to present her best disability case; and (3) relying upon a defective hypothetical. (Doc. 12 at 1.) I will address each of Claimant's arguments in the order presented. The weight the ALJ gave various medical opinions and how the ALJ weighed Claimant's subjective complaints was reflected in the hypothetical presented to the VE.

## A.    *The ALJ properly evaluated the opinion of Claimant's treating physician.*

Claimant argues that the ALJ improperly weighed the opinion evidence in her case. Specifically, Claimant takes issue with the ALJ giving controlling weight to the opinions of the state agency physicians who reviewed her record over the opinion of her treating physician. Claimant asserts that Dr. Tracy Kahl is her treating physician. Dr. Kahl is board certified in family medicine. (AR at 596.) The following physicians provided medical opinions in this case.

### 1.    *Dr. Kahl's Opinion*

Dr. Kahl is Claimant's family physician. (*Id.*) Dr. Kahl began treating Claimant on March 24, 2015 and wrote her opinion on May 28, 2015. (*Id.* at 589, 596.) Dr. Kahl opined that Claimant is incapable of performing a full-time job that is eight hours per day, five days per week. (*Id.* at 590.) Dr. Kahl also opined that Claimant is incapable of performing part-time work. (*Id.*) In Dr. Kahl's opinion, Claimant's maximum ability to stand and walk during an 8-hour workday would be about two hours. (*Id.* at 593.) Claimant's ability to sit during an 8-hour workday would be about four hours. (*Id.*) According to Dr. Kahl, Claimant is limited to lifting and carrying ten pounds or less occasionally. (*Id.* at 591.) Dr. Kahl acknowledged that Claimant's orthopedist stated that Claimant had a 15-pound lifting restriction.[4] (*Id.*) Dr. Kahl opined that Claimant could do the following occasionally: twist, climb, kneel, crouch, reach, pull, push, firmly

---

[4] The form Dr. Kahl filled out did not allow her to choose a 15-pound lifting and carrying limit. Lifting and carrying limits are listed in ten-pound increments. (AR at 591.)

grasp with both her hands, finely grasp with both her hands, work overhead, use static neck flexion, frequently rotate her neck, and walk up an incline. (*Id.* at 592.) Dr. Kahl further opined that Claimant could never bend, stoop, or crawl. (*Id.*) In addition, Dr. Kahl stated that Claimant would need four fifteen-to-twenty minute unscheduled breaks during the workday in addition to the standard two breaks and a lunch. (*Id.* at 591.) Finally, Dr. Kahl opined that symptoms related to Claimant's impairments woulds cause Claimant to be absent from work four or more times per month. (*Id.*)

The ALJ gave Dr. Kahl's opinion little weight. Dr. Kahl's opinion will be discussed below.

### 2. State Agency Medical Consultants Gary Cromer, M.D. and Jan Hunter, D.O.

On June 9, 2015, state agency medical consultant Gary Cromer, M.D. opined that Claimant could occasionally lift and/or carry ten pounds; frequently lift and/or carry ten pounds; stand or/or walk two hours in an eight-hour day; sit six hours in an eight-hour day; occasionally balance, stoop, kneel, crouch, and climb ramps and stairs; frequently handle and finger; do unlimited pushing and/or pulling with a ten-pound limit; do unlimited reaching; never climb ladders, ropes or scaffolds, or crawl; and should avoid concentrated exposure to extreme cold and vibration. (*Id.* at 60-61.) On July 30, 2015, state agency medical consultant Jan Hunter, D.O. affirmed Dr. Cromer's opinion. (*Id.* at 77.) The ALJ weighed these opinions as statements from non-examining expert sources. (*Id.* at 21.) The ALJ concluded that the state agency physicians adequately considered the "medical evidence of record" and assigned great weight to the opinions because "they are consistent with the medical evidence of record." (*Id.*)

### 3.    *Consulting Psychologist Suzanne Keizer, Ph.D.*

On May 15, 2015, consultative psychological examiner Suzanne Keizer, Ph.D. opined that Claimant would experience some limitations in her ability to maintain attention, concentration, and mental pace for an eight-hour day and this would likely fluctuate given her level of pain, use of medications, and "amount of restorative sleep." (*Id.* at 587.)  Dr. Keizer further opined that Claimant would have mild limitations in her ability to respond appropriately to changes in the workplace, but that her ability to interact in the workplace was appropriate. (*Id.*)  The ALJ found Dr. Keizer's opinion persuasive and assigned it great weight because "the expert is a specialist who is familiar with social security policy and regulations, she personally examined the claimant, and provided an explanation with references [to] her examination findings to support her opinion." (*Id.* at 21.)

### 4.    *State Agency Psychological Consultant Jennifer Ryan, Ph.D.*

On March 20, 2014, state agency psychological consultant Jennifer Ryan, Ph.D. opined that Claimant had mild restrictions in activities of daily living; no difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*Id. at* 62-64.)  Dr. Ryan opined that Claimant was able to carry out instructions consisting of three-and-four steps and perform work tasks consistent with that ability. (*Id.* at 64.)  On July 31, 2015, state agency psychological consultant Myrna Tashner, Ph.D. affirmed Dr. Ryan's opinion. (*Id.* at 79.)  The ALJ assigned the opinions substantial weight because they were "well supported with specific references to medical evidence, [were] . . . internally consistent as well as consistent with the evidence as a whole, [and because there was] no objective evidence contradicting" the findings of the state agency psychological consultants. (*Id.* at 21.)  The ALJ did, however, disagree with the state agency psychologists by finding that Claimant "only has mild limits in her ability to maintain concentration, persistence, and pace." (*Id.*)

Claimant was treated by several physicians who did not provide medical opinions. Their treatment notes will be discussed in the relevant sections of this Report and Recommendation because they are the documents upon which Claimant bases many of her arguments.

### 5.    *Analysis*

An ALJ's RFC must ordinarily be supported by a treating or examining source opinion to be supported by substantial evidence. *See Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record as a whole.[5] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and brackets omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent

---

[5] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claim was filed on February 11, 2015. Thus, the old regulations apply. *See id.*

with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted).

Claimant argues that the ALJ improperly weighed Dr. Kahl's opinion for the following reasons:

> Dr. Kahl was consistent with the examination of rheumatologist, Robert Wisco M.D. who found [Claimant's] body pain complaints consistent with fibromyalgia. She continued to receive treatment for management of her fibromyalgia and back pain under Dr. Michael Espiritu, M.D. The ALJ doesn't specifically reject Dr. Wisco or Espiritu. Dr. Allison Kovar, M.D. assessed her with anxiety, generalized osteoarthritis, obesity, depressive disorder, and fibromyalgia. Plaintiff's diagnosis by Dr. Kovar was rejected by the ALJ's decision without specific credibility reasons.
>
> Thus, we have long standing treatments over a longitudinal time period for fibromyalgia and back pain by doctor's [sic] Wisco, a rheumatologist, and Espiritu, an orthopedist, and doctors Johnson, Kovar and Kuhl [sic], who consistently diagnose her with these problems and treat their patient for the problems. Yet, the ALJ rejects all of them and finds that the non-examining state doctors have a "better understanding of the Claimant" and gave "great weight" to the opinions of the state doctors.

(Doc. 12 at 4-5) (internal citations omitted).

When a treating physician's medical opinion is not given controlling weight, the following factors will be applied to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

The ALJ did not err in failing to give Dr. Kahl's opinion controlling weight because it is "inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c). The proper weight to give this non-controlling physician opinion is determined through an analysis of the six factors listed above.

### a.     *Length and Frequency of the Treatment Relationship*

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i).  One reason the ALJ assigned little weight to Dr. Kahl's opinion was that Dr. Kahl did not have a longitudinal treating history with Claimant, having  treated her for less than two months.  (AR at 22.) During that time, Dr. Kahl saw Claimant twice before she wrote her opinion: on March 24, 2015 and on May 19, 2015. (AR at 603-07.)[6] Claimant saw Dr. Kahl for a "recheck of chronic lumbar back pain," "recheck of obesity," and "recheck of anxiety," and what appears to be a general physical.

A physician will usually be considered a treating source if the physician has seen the claimant "a number of times and long enough to have obtained a longitudinal picture of the claimant's impairment." 20 C.F.R. § 404.1527(c)(2)(i); *Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (holding that a physician's opinion was not entitled to controlling weight of a treating source because the physician had only met with the claimant three times prior to filing her opinion letter); *Bonner v. Colvin*, No. 4:14CV1951NCC, 2016 WL 51085, at *11 (E.D. Mo. Jan. 5, 2016) (finding ALJ's decision to give psychiatrist's opinion little weight "consistent with the Regulations and case law" when the psychiatrist had seen claimant, at most, twice).

Claimant admits that she only saw Dr. Kahl "for a short period of time" (Doc. 14 at 1), but argues that because Dr. Kahl works at Family Medicine Clinic, where Claimant was a patient for years, there is a "basis for [Dr. Kahl's] report and continuation of care." (*Id.*)  Claimant cites no precedent to support this position.  Likewise, I am not aware of

---

[6] Dr. Kahl continued to see Claimant after she wrote her opinion, but at this stage of evaluating her opinion, only the information Dr. Kahl knew at the time she wrote the opinion is relevant.

any precedent that supports this position, especially in this case where Dr. Kahl did not cite any Family Medicine Clinic records in her report or specifically refer to any findings of her Family Medicine colleagues, in spite of referring to lifting restrictions placed on Claimant "per orthopedist." (AR at 591.) Accordingly, I find that this factor weighs in favor of affording the opinion little weight.

### b.    Nature and Extent of the Treatment Relationship

"The more knowledge a treating source has about [a claimant's] impairment(s) the more weight the [ALJ] will give the source's opinion." 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ "will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered." *Id.* Claimant saw Dr. Kahl for chronic back pain, anxiety rechecks, unspecified hypothyroidism rechecks, and obesity rechecks. (AR at 600-07.) Dr. Kahl prescribed and refilled chronic pain medications and anxiety medications, and continued Claimant on other medications she was previously taking. (*Id.* at 597, 600-02, 605.) During her office visits with Dr. Kahl, Claimant would describe her symptoms to Dr. Kahl and tell her if she thought her current medications were providing relief. (*Id.* at 600-04.) Dr. Kahl would then document Claimant's symptoms and write an "Assessment and Plan" that contained her documentation of the medications she was prescribing. (*Id.*) It appears that Dr. Kahl performed one physical examination of Claimant before writing her opinion. (*Id.* at 604-05.) At this examination, Claimant was feeling well and had no joint or muscle pain and no weakness. (*Id.* at 604.) Claimant's lumbar spine examination revealed no swelling, edema, or erythema, normal strength and tone, no laxity or crepitus, and normal sensation. (*Id.*) Claimant had normal posture, gait, coordination, and reflexes. (*Id.*) She also had a negative straight leg raise test bilaterally, although there was some pain and tightness in her paraspinal muscle. (*Id.*) Claimant's lower extremity examinations were all normal. (*Id.*) Claimant was stable on her then-current anxiety medications. (*Id.*

at 605.) Dr. Kahl did not perform any specialized tests or order any tests, other than standard blood tests, to address Claimant's complaints. (*Id.*) Dr. Kahl noted that Claimant's degenerative lumbar disc caused Claimant chronic pain, which resulted in "chronic narcotic use x years, impairs ability to work, [secondary][7] to difficulty standing and pain meds interfere with concentration, no work x 3 years now. Disability forms completed please see attached." (*Id.*)

In her opinion, Dr. Kahl stated that she relied on an MRI performed sometime before she wrote her report and the lifting restriction placed on Claimant by an orthopedist, both of which will be discussed below, but Dr. Kahl's records, themselves, do not provide a basis upon which to conclude she had the knowledge of, or a relationship with, Claimant that supported her opinion. To the extent Dr. Kahl's treatment notes support the limits she puts on Claimant's ability to work, those limits appear to be the result of Claimant's self-reports, and not any clinical assessments. None of Dr. Kahl's pre-opinion notes mention side effects of medications, except that Lyrica exacerbated Claimant's depression and anxiety symptoms. (*Id.*) However, Dr. Kahl took Claimant off Lyrica. (*Id.*) The pain specialist also apparently had discontinued Nucynta at some previous time because the drug "messed with [Claimant's] mood." (*Id.* at 603.) Thus, the knowledge Dr. Kahl has about Claimant's impairments is largely derived from subjective complaints that the ALJ determined were not credible and, therefore, this factor weighs in favor of affording the opinion little weight.

### c. *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or

---

[7] Dr. Kahl uses the abbreviation 2° for "secondary." *See* https://en.wikipedia.org/wiki/List_of_ medical_ abbreviations:_0%E2%80%939.

eliminate the weight given [her] opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Circuit 2006). In addition, "'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quotation omitted).

Dr. Kahl provided her opinion on a check box form. The form Dr. Kahl used for her opinion, entitled "Social Security General Medical Source Statement," is seven pages long, not including the signature page, and consists mostly of questions with check-box pre-printed answers, with the exception of three places wherein Dr. Kahl could write narrative comments: "Diagnosis of Condition(s) for which you have treated the above patient," "please specify [patient's mental health diagnosis]," and "[d]o you have any additional comments that bear on this patient's capacity to for performing work activities?". (AR at 589-96.) Dr. Kahl listed the following diagnoses for which she was treating Claimant: fibromyalgia, degenerative disc of lumbar spine and degenerative joint

disease lumbar spine; lower extremity radicular pain; anxiety; asthma; hypothyroidism; chronic pain syndrome, degenerative arthritis—knees. (*Id.* at 589.)

In Dr. Kahl's opinion, Claimant's maximum ability to stand and walk during an 8-hour workday would be about two hours and her ability to sit would be about four hours. (*Id.* at 593.) Dr. Kahl chose these limitations from checklists. (*Id.*) Dr. Kahl provided no reasons or support for these limits in her opinion, but checked the boxes that indicated that working would cause "extreme" increase in the severity of Claimant's symptoms. (*Id.*) Dr. Kahl also opined that Claimant is limited to lifting and carrying ten pounds or less occasionally. (*Id.* at 591.) Dr. Kahl supported this conclusion by referring to the opinion of Claimant's "orthopedist," who gave Claimant had a 15-pound lifting restriction.[8] (*Id.*) The record does not indicate that Dr. Kahl, herself, ever tested Claimant's lifting capabilities. Dr. Kahl opined that Claimant could do the following occasionally: twist, climb, kneel, crouch, reach, pull, push, firmly grasp with both her hands, finely grasp with both her hands, work overhead, use static neck flexion, frequently rotate her neck, and walk up an incline. (*Id.* at 592.) Dr. Kahl further opined that Claimant could never bend, stoop, or crawl. (*Id.*) In addition, Dr. Kahl stated that Claimant would need four fifteen-to-twenty minute unscheduled breaks during the workday in addition to the standard two breaks and a lunch. (*Id.* at 591.) Finally, Dr. Kahl opined that symptoms related to Claimant's impairments would cause Claimant to be absent from work four or more times per month. (*Id.*) All of these limitations were chosen from check lists. In spite of these limitations, Dr. Kahl stated that Claimant could not do sedentary work, which was defined on the form as "lifting up to 10 lbs. occasionally, lifting and carrying small items, standing/walking no more than two hours in an eight-hour day." (*Id.* at 590.)

---

[8] The form Dr. Kahl filled out did not allow her to choose a 15-pound lifting and carrying limit. Lifting and carrying limits are listed in ten-pound increments. (AR at 591.)

The ALJ gave Dr. Kahl's opinion little weight, in part, because Dr. Kahl's opinion appeared "to be the product of pre-printed questionnaires, submitted to Dr. Kahl by the claimant's attorney, that includes a number of leading questions and similar inducements which are not designed for objective responses, but rather for verification of legal conclusions about the claimant's alleged impairments." (*Id.* at 22.) The ALJ opined that although the form does provide for both negative and positive "check-off responses," the form "appears to be intended to further the claimant's litigation interests rather than provide an objective medical evaluation of her functional limitations because the opinions related to functional limitations are not supported with objective medical findings and are inconsistent with the substantial evidence of record." (*Id.*)

I disagree with the ALJ to the extent that the ALJ found the checklist form biased in Claimant's favor. While the form certainly demonstrates that it was written by someone who understands what is relevant in a Social Security case, I do not find the form to be overly Claimant-friendly. The form demonstrates an effort to be complete and obtain information about many relevant issues that may reflect on a Claimant's health and ability to work. That being said, the form is still a form.

The form suffers from the same deficiencies that the Eighth Circuit cautions against. There is no room for physician narrative or opinion, and the result is a series of conclusory statements, checked blanks, "circled answers, and brief fill-in-the-blank responses" by Dr. Kahl that "cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value." *Thomas*, 881 F.3d at 675. While Dr. Kahl supplements her opinion by stating that her opinions related to Claimant's "fair to poor ability" to understand and carry out any type of job instructions is "secondary to [her] anxiety and [due to] pain medication side effects" (AR at 594) and that her opinions related to Claimant's abilities to function in the workplace would only be fair to poor because of anxiety and medication side effects (*Id.* at 594-95), these are the only places

where Dr. Kahl supplements the check box with her own opinion. These comments should help bolster the strength and credibility of the opinion. However, they do not.

As discussed above, Dr. Kahl's treatment notes regarding side effects from medications and how anxiety affects Claimant all seem to be from Claimant's self-reports. (*Id.* at 603, 605.) Dr. Kahl does not document these side effects anywhere else in her treatment notes. Importantly, Dr. Kahl notes on May 19, 2015 when the note documenting concentration appears in her treatment notes that the "Pain Specialist made the med change [to add Lyrica] a week ago." (*Id.* at 603.) Lyrica was causing Claimant to increased pain, "weepiness," to "not feel well," and was "messing with her SSRI [selective serotonin reuptake inhibitor]." (*Id.*) Dr. Kahl stopped the Lyrica due to these side effects. (*Id.* at 605.) At the previous appointment on March 24, 2015, Claimant's anxiety was "improved." (*Id.* at 603.)

Dr. Kahl's treatment notes contain no mental health assessments or tests. (*Id.* at 603-07.) Even though Claimant was experiencing weepiness and other undesirable side effects from the Lyrica, Dr. Kahl's March 24, 2015 treatment notes merely indicate that Claimant's mental status was "alert" and Claimant was "not in acute distress." (*Id.* at 604.) More importantly, Dr. Kahl's treatment notes say that Claimant's anxiety does *not* cause Claimant difficulty concentrating. (*Id.* at 600, 603.)[9]

In addition, the limitations Dr. Kahl placed on Claimant's sitting and standing all seem to stem from Claimant's self-reports (*Id.* at 603) because there are no assessments in Dr. Kahl's treatment notes. In spite of claiming she is so limited, Dr. Kahl's physical examination of Claimant on the day she wrote her opinion yielded mostly normal results. (*Id.* at 604.) Claimant's lumbosacral spine examination revealed no swelling, edema, or

---

[9] Although Dr. Keizer's psychological assessment was completed on May 9, 2015 and electronically signed on May 14, 2015 (AR 583-88), there is no indication that Dr. Kahl ever saw this assessment. Dr. Kahl never mentions the assessment in her opinion or other treatment notes.

erythema of surrounding tissue; normal strength, tone, sensation, posture, gait, coordination, reflexes; negative bilateral straight leg raises; no laxity or crepitus, and only pain and tightness of the paraspinal muscles lumbar. Examination of Claimant's femurs revealed no tenderness to palpation; no pain; normal movement, range of motion, and no crepitus. (*Id.*) None of Dr. Kahl's treatment notes document hand or finger problems. Importantly, Dr. Kahl never noted that Claimant experienced an episode of decompensation in front of her or reported such an episode to her. Accordingly, there is no support for Dr. Kahl's opinion that Claimant would experience one or two such episodes in a year that would last for two weeks. (*See id.* at 594.) In addition, Dr. Kahl's treatment notes do not document any discussions regarding Claimant's need to take several breaks a day, which means that Dr. Kahl's limitation regarding the number breaks Claimant would need in a work day is also unsupported by Dr. Kahl's treatment notes.

Dr. Kahl's treatment notes do not support her opinion that Claimant is incapable of performing a full-time job. Therefore, this factor should weigh in favor of giving this opinion little weight. Moreover, decisions regarding a claimant's ability to work are left to the sole discretion of the Commissioner. *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (quoting *Stormo*, 377 F.3d at 806).

### d.    Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). Dr. Kahl wrote her opinion on May 28, 2015. As the ALJ noted, two months prior to that, on March 18, 2015, Claimant reported to the Social Security Administration that her pain/fatigue does not affect her ability to concentrate or think. (AR at 217.) She also reported in one of her function reports that she can pay attention "all the time" and that her ability to follow spoken instructions was "good." (*Id.* at 224.)

On the same date, Claimant stated that she got along with authority figures "very well" and that her ability to handle stress and changes in routine was "good." (*Id.* at 225.) Claimant also reported that the only side effect she experienced from her pain medications was "tiredness." (*Id.* at 216.) At that time, Claimant was taking morphine and hydrocodone. (*Id.*) Claimant stopped taking the morphine, but continued with the hydrocodone. (*Id.* at 603.) Since that time, Claimant told the Social Security Administration that she has no side effects from her pain medications. (*Id.* at 249, 259.) Claimant's function report from July 22, 2015 continued to state that she can pay attention, finish what she starts, and follow both written and spoken instructions "ok." (*Id.* at 257.)

Claimant argues that Dr. Kahl's opinion is consistent with the opinion of Dr. Wisco, "who found [Claimant's] body pain complaints consistent with fibromyalgia." (Doc. 12 at 4.) Dr. Robert Wisco saw Claimant once on May 4, 2012 and diagnosed her with "[b]ilateral hand dysesthesias, perhaps related to carpel tunnel syndrome," and "problems . . . related to fibromyalgia." (AR at 317.) I agree. The ALJ agreed.

The ALJ found that fibromyalgia was one of Claimant's severe impairments. (*Id.* at 12.) However, the only thing that Dr. Wisco confirmed was that the symptoms Claimant described to him and his examination of Claimant on that day indicated that Claimant's symptoms and pain were "consistent with [fibromyalgia]" and that Claimant "perhaps" had carpal tunnel syndrome. (*Id.* at 317.) Dr. Wisco said nothing about medication side effects and how they might contribute to Claimant's ability to work eight hours a day, whether she could lift certain weights, use her hands, sit or stand for certain lengths of time, or walk certain distances. (*Id.*) Thus, contrary to Claimant's argument, except for corroborating Claimant's fibromyalgia and carpal tunnel diagnoses, two things that are not at issue in this case, Dr. Wisco's treatment note does not support the limitations in Dr. Kahl's opinion.

Claimant also asserts that she "continued to receive treatment for management of her fibromyalgia and back pain under Dr. Michael Espiritu, M.D. The ALJ doesn't specifically reject Dr. . . . Espiritu." (Doc. 12 at 4.) Again, this argument would be without merit because no one argues that Claimant does not have fibromyalgia or back pain. However, Claimant has her timeline backwards. While it is certainly possible that Claimant continues to treat with Dr. Espiritu for her fibromyalgia, the Administrative Record does not contain those treatment records.

The Administrative Record contains records from Center for Neurosciences Ortho & Spine ("CNOS") from August 2, 2011 to September 6, 2012. They document seven visits with Dr. Espiritu. During the first three visits—August 2, 2011; August 18, 2011; and August 25, 2011 (AR 308-15)—Dr. Espiritu was trying to diagnose the source of Claimant's back pain. Dr. Espiritu opined that Claimant had "an exaggerated response to pain" that may be the result of "a pain syndrome." (*Id.* at 308, 314.) On August 25, 2011, Dr. Espiritu stated that Dr. Johnson would see Claimant "for evaluation for a possible pain syndrome and medial treatment." (*Id.* at 314.) Claimant had not yet been diagnosed with fibromyalgia. The next treatment note from CNOS is from Dr. Wisco, who diagnosed Claimant with fibromyalgia. (*Id.* at 317.) Claimant next saw Dr. Espiritu on July 12, 2012 for treatment of her carpal tunnel syndrome, which Dr. Wisco also diagnosed. (*Id.* at 319.) At this office visit, Dr. Espiritu acknowledged that Claimant had fibromyalgia and his physical examination focused on Claimant's wrists, hands, and knee. (*Id.*) A week later, Claimant followed up with Dr. Espiritu regarding her carpal tunnel syndrome. (*Id.* at 325.) The final records from CNOS are surgical records for Claimant's carpal tunnel release surgeries performed by Dr. Espiritu. (*Id.* at 327-31.)

The Administrative Record contains no treatment notes from Dr. Espiritu providing fibromyalgia management or treatment.[10]

To conclude, Dr. Espiritu agreed that Claimant has carpal tunnel syndrome, which he treated with surgery.  He also felt Claimant might have "a pain syndrome," and later acknowledged Claimant's fibromyalgia diagnosis.  However, I find that nothing in Dr. Espiritu's treatment notes support the limitations in Dr. Kahl's opinion.

Claimant also avers that the ALJ "reject[ed]" the findings of Dr. Todd C. Johnson in favor of the state agency physicians, assumedly because Dr. Johnson's findings support Dr. Kahl's opinion.  (Doc. 12 at 5.)  The administrative record includes six treatment notes from Dr. Johnson.  Two treatment notes are for injections, which tells us nothing about Dr. Johnson's impressions.  (AR at 508-09, 513-16, 540-43, 553-54.)  The other treatment notes document appointments to check medications.

On June 3, 2013, Claimant met with Dr. Johnson for a medication check and complained of pain due to fibromyalgia and what she thought was rheumatoid arthritis in her right knee.  (*Id.* at 508.)  At that time, she felt her medications were controlling her pain.  (*Id.*)  Claimant was in no acute distress, had stable vital signs, and grossly intact upper and lower extremity strength and range of motion.  (*Id.*)  On July 29, 2013, Claimant saw Dr. Johnson for a medication check and an injection.  (*Id.* at 513.)  On that day, she was having pain in her gluteus medius bursa, and was receiving an injection to

---

[10] I note that the ALJ erred on page 18 of the Administrative Record where she stated "The claimant continued with Dr. Espiritu on April 1, 2013 for management of fibromyalgia and back pain."  The rest of the paragraph also reads as if the medical appointments discussed were with Dr. Espiritu.  (AR at 18.)  They were not.  All of these appointments were with Physician's Assistant ("PA") Nicholas E. Fernando, who provided pain medication management for Claimant.  (*Id.* at 502, 510, 517, 520, 525.)  Dr. Espiritu was the referring provider for all the appointments.  (*Id.*)  While having Dr. Espiritu refer Claimant to PA Fernando indicates that Dr. Espiritu was still Claimant's physician, Dr. Espiritu cannot be cited for making the medical evaluations and reaching the conclusions of PA Fernando or for prescribing the medications PA Fernando prescribed on those dates.

address the problem. (*Id.*) Claimant was "stabilized" on her medications. (*Id.*) Claimant met with Dr. Johnson on April 28, 2014 stating she had back pain that was worse with activity and knee pain. (*Id.* at 540.) Dr. Johnson also noted that Claimant had a "long-standing history of chronic pain. She has an underlying diagnosis of chronic pain syndrome, myofascial pain, narcotic tolerance, degenerative joint disease." (*Id.*) On that date, Dr. Johnson documented crepitus in the right knee with flexion and extension and tenderness to palpation of her lumbar spine, but no acute distress. (*Id.*) On September 19, 2014, Dr. Johnson saw Claimant and noted that the medication changes PA Fernando recently made were benefitting Claimant, that Claimant was in no acute distress, and that her strength and range of motion were grossly intact. (*Id.* at 553-54.)

Once again, nothing in Dr. Johnson's treatment notes is at odds with the ALJ's conclusions. Dr. Johnson noted that Claimant has a history of chronic pain syndrome, which is consistent with the ALJ's finding of fibromyalgia. In addition, Dr. Johnson's treatment notes document that Claimant was not in acute distress during their appointments, had mostly normal examination results, and was experiencing symptom relief with her medications, which means she was not disabled under Social Security rules. *See Stout*, 988 F.2d at 855. The only "side effect" discussed in Dr. Johnson's treatment notes is the expense of one of Claimant's medications, which is something Claimant did not like. (AR at 508, 553.) Contrary to Dr. Kahl's assertions in her opinion, confusion was never mentioned as a medication side effect. Therefore, Dr. Johnson's treatment notes are not consistent with Dr. Kahl's opinion.

Claimant also argues that "Plaintiff's diagnosis by Dr. Kovar was rejected by the ALJ's decision without credibility reasons." (Doc. 12 at 5.) I do not agree. The ALJ stated the following with respect to Dr. Kovar:

> The claimant was seen by Allison Kovar, M.D. January 9, 2015 complaining of worry, fatigue, irritability, and panic attacks. On exam, she was cooperative, alert, and in no acute distress. Her gait was normal, and

she was able to articulate well with normal speech and coherence. She was assessed with anxiety, generalized osteoarthritis, obesity, depressive disorder, and fibromyalgia. She was started on Vibryd.

(AR at 19.) I find that there was no "rejection" of this diagnosis. This is merely a fair recitation of what occurred during the one interaction Claimant had with Dr. Kovar. Moreover, the ALJ agreed in part with Dr. Kovar's assessment. The ALJ found that Claimant's obesity and fibromyalgia were severe impairments and considered the effects of Claimant's obesity during her analysis, including when crafting Claimant's RFC. (*Id.* at 12, 20.) Claimant does not direct the Court to any part of the ALJ's opinion that "rejects" this treatment note or to any part of this treatment note that is particularly supportive of Dr. Kahl's opinion. Finally, the ALJ was not required to "accept" or "reject" Dr. Kovar's treatment note, but only to consider it as she would consider any other piece of medical evidence. The rules require ALJs to weigh physicians' "opinions" not treatment notes or medical records. *See* 20 C.F.R. §§ 404.1520c, 404.1527. The ALJ did so.

In large part, the state agency physicians' opinions are also in concert with Dr. Kohl's opinion. Most importantly, the state agency physicians agree that Claimant has fibromyalgia and back pain. (*Id.* at 62.) The state agency physicians, however, note that Claimant has not participated in physical therapy when it was offered, which undermines her credibility. (*Id.* at 320, 641 (Claimant reported to Dr. Kahl, physical therapy "doesn't work, they make me lay across a ball")). Although Claimant stated that she wanted to "do that on her own at home," she admits that she does not stretch or exercise. (*Id.* at 45, 320, 638) in spite of being encouraged to do so by PA Fernando (*Id.* at 536, 545, 564, 566, 569). Just as Dr. Kahl did, the state agency physicians imposed a ten-pound lifting limit. (*Id.* at 60.) However, the state agency physicians' limit is lifting ten pounds "frequently," rather than lifting ten pounds "occasionally." (*Id.*) Claimant testified that after her carpal tunnel surgery, Dr. Espiritu gave her a lifting limit of "10

to 15 pounds." (*Id.* at 42.)  On March 18, 2015, Claimant told the Social Security Administration that she could lift ten pounds.  (*Id.* at 210.) Claimant never said that her lifting was limited to occasionally.  As discussed above, Dr. Kahl does not provide any support for her conclusion that lifting must be limited to "occasionally" and recent evidence, such as Claimant's own hearing testimony does not support this conclusion. Moreover, the form that Dr. Kahl used to write her opinion provides no definition of "occasionally."

Both Dr. Kahl and the state agency physicians also agree that Claimant has the ability to perform repetitive hand/finger actions.  (*Id.* at 61, 592, 593.)  Dr. Kahl opines that Claimant can grasp occasionally, that she has "good use of the hands for repetitive hand-finger actions" and that she can "manipulate, handle, and work with small objects with both hands." (*Id.* at 592-93.)  The state agency physicians opine that Claimant can frequently handle and finger.  (*Id.* at 61.)   Under the state agency definition of "frequently" this means that Claimant can do these activities "cumulatively more than 1/3 up to 2/3 of an 8 hour day." (*Id.* at 60.)   The form Dr. Kahl used to write her opinion has no definitions for "occasionally" or "frequently."   The state agency physicians supported their opinions with citations to objective medical evidence in the record and Claimant's own statements regarding her daily activities and abilities.  (*Id.* at 62.)

Furthermore, Dr. Kahl's opinion is inconsistent with Claimant's own statements regarding the effectiveness of treatment.  Claimant reported that her medications are helpful in reducing her pain.  (AR at 487, 493, 496, 499, 505, 508, 517, 520, 522, 525, 528, 544, 558.)  *See Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").  Most recently, Claimant told Dr. Kahl on January 20, 2017 that her fibromyalgia episodes were "moderate" and that her medications "seem to be working

ok." (*Id.* at 621.)[11]  Although Claimant had times when medications did not provide effective pain relief, she and PA Fernando worked together to change her medications, get referrals for injections, or find other ways to provide Claimant with the best pain management for her then-current situation.  (*Id.* at 483-582.)  During her appointments with PA Fernando, Claimant consistently rated her pain level between 3 and 6 on 1-10 scale.  (*Id.*)  In PA Fernando's most recent treatment notes, dated August 2014 to March 2015, Claimant rated her pain as 4 out of 10, which indicates that she was experiencing steady pain control.  (*Id.* at 551, 556, 559, 562, 565, 568, 571.)  Importantly, during three-and-one-half years of seeing PA Fernando for pain medication management, Claimant never told him that her medications made her confused.  After several treatment notes wherein PA Fernando noted Claimant's long-term use of opiates and her opiate-dependence, he noted that Claimant felt she had developed a tolerance to the narcotics and that she "is tired of the opioid feeling that she is getting." (*Id.* at 561.)  "The opioid feeling" is never explained.  This is the only reference to anything resembling confusion from pain medications, and it is far from a clear reference to confusion.  PA Fernando counseled Claimant every month regarding her medications and the side effects associated with using different medications.  PA Fernando's treatment notes indicate that Claimant was honest about her health during appointments with him.  There is simply a dearth of evidence to support Dr. Kahl's opinion regarding the side effects that Claimant's medications have on her concentration.

Objective medical evidence is not consistent with Dr. Kahl's opinion.  Claimant had imaging of her spine and pelvis done in July 2011.  The tests revealed only minimal orthopedic issues.  A CT of Claimant's pelvis indicated degenerative arthritis of the right

[11] Although it was appropriate to only evaluate the information available to Dr. Kahl at the time she wrote her opinion when evaluating her own support for her opinion, at this stage of my evaluation, I must consider all the information available to the ALJ at the time she rendered her decision.

L5-S1 facet, with slight prominence at the disc margin and narrowing of the right L5 foramen, and fairly minimal degenerative changes involving the right L4-5 facet. (*Id.* at 372.) An MRI of Claimant's lumbar spine revealed very mild bulging of the posterolateral disc margins, more notably on the left at L2-3 and on either side at L3-4 and L4-5, which causes some borderline foraminal stenosis particularly for L3 and L4 nerve roots without actual compression—a little worse on the left than on the right. (*Id.* at 377.) X-rays of Claimant's spine revealed that "minimal disk degenerative changes and scoliosis [were] largely stable, substantial hypertrophic osteoarthritic changes involving the facet at L5-S1 on the right appear[ed] to be present and stable." (*Id.* at 379.) In addition, x-rays of Claimant's knee taken in June 2012 showed only a "small joint effusion," but were normal in all other respects. (*Id.* at 365.)

In addition, Claimant consistently had only mild muscle spasms in her lumbar spine, lumbar pain that was elicited by motion, no cervical spine atrophy, full range of motion in her cervical spine, negative straight leg raise testing, normal gait and stance, and no lower extremity weakness during her monthly examinations by PA Fernando. (*Id.* at 491, 494, 497, 500, 503, 511, 518, 521, 523, 526, 538, 545, 548, 551, 556, 559, 562, 565, 568, 571.) For a time, Claimant complained about hand pain and/or knee pain and PA Fernando did note tenderness on palpation and elicited pain with motion for both the hand and the knee during those visits. (*Id.* at 506, 511, 518, 520-21, 526, 529, 532, 535, 538, 548, 551.) The knee pain sometimes caused Claimant to limp. (*Id.* at 529, 532, 535.) Those issues, however, seem to have resolved because PA Fernando did not document hand pain after March 24, 2014 (*Id.* at 538) or knee pain after August 19, 2014 (*Id.* at 551). Claimant did not mention hand or knee pain during the hearing on this matter. Claimant testified that her fibromyalgia pain is mostly in her back, but that she has "flare-ups" and she "hurt[s] all over." (*Id.* at 48.) Claimant also admits that her weight and her smoking contribute to her chronic pain and she and PA Fernando

discussed weight loss, exercise, and smoking cessation during her appointments; PA Fernando provided resources related to smoking cessation and Claimant stated that she was working with another physician on weight loss. (*Id.* at 536, 545, 552, 561, 564, 566, 568-69, 572.)

Moreover, Claimant had consistently normal musculoskeletal examinations by Dr. Kahl, who noted only "pain and tightness of paraspinal muscles lumbar." (*Id.* at 601, 604, 622, 628, 631, 634, 639, 642, 645, 648.) Claimant also had consistently normal lower extremity examinations by Dr. Kahl, with the exception of a July 22, 2016 examination where there was "grinding of the patella with flexion and extension bilaterally." (*Id.*)

Dr. Kahl refers to a 15-pound lifting limit by Claimant's "orthopedist," apparently Dr. Espiritu, an orthopedic surgeon. However, I see no lifting limitation in Dr. Espiritu's treatment notes. At the hearing, the ALJ and Claimant's then-attorney could not find documentation of the lifting limitation in the record. (*Id.* at 36, 41-42.) Accordingly, because Dr. Kahl never conducted her own strength tests and because there is no documentation in the record to support this limitation, this part of Dr. Kahl's opinion is also not consistent with the record.

In addition, Claimant's reported daily activities are not consistent with the limitations in Dr. Kahl's opinion. Claimant reported to Dr. Keizer that for recreation, she visits friends' camp sites and plays with her grandson (*Id.* at 586), and goes tanning (*Id.* at 220). On a daily basis, Claimant can dress, shop (with help carrying groceries), take care of her own personal hygiene, and prepare meals. (*Id.*) She reported to the Social Security Administration that she can get her son ready for school, drive him to school, and do light house cleaning and laundry. (*Id.* at 220-21.) Claimant visits with friends or family four-to-five times a week, fishes when she can, and goes "light"

swimming in the summer. (*Id.* at 223.) Claimant also reported that she has no limitations on the use of her hands. (*Id.* at 224, 235.)

To conclude, the basis for Dr. Kahl's opinion that Claimant would have difficulty following instructions in a work setting and concentrating in a work setting is that Claimant's anxiety and the side effects from her medications make her confused. Dr. Kahl also opined that Claimant would have rather severe functional limitations. Dr. Kahl is the only physician who documents confusion in her records. Thus, confusion seems to stem only from Claimant's self-reports. And, Claimant is inconsistent in reporting confusion because she told the Social Security Administration that she can pay attention and finish tasks. (*Id.* at 224, 257.) Importantly, Claimant focuses her disagreement with the ALJ's weighing of Dr. Kahl's opinion on her "fibromyalgia and back pain." However, Dr. Kahl's opinion is not consistent with the medical evidence and other evidence in the record related to her fibromyalgia and back pain and any limitations they may cause Claimant. This factor weighs in favor of affording the opinion little weight.

### e. *Specialization*

"[The ALJ will] generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Kahl is board certified in family medicine. (AR at 596.) The ALJ found that Claimant suffers from the following severe impairments: degenerative disc disease, fibromyalgia, obesity, and history of bilateral carpal tunnel release surgeries. (AR at 12.) The ALJ also found that Claimant had the following nonsevere impairments: hypothyroidism, anxiety, depression, and patellofemoral syndrome of the right knee. (*Id.* at 13.) Dr. Kahl is not a specialist in orthopedics, pain management, nutrition, neurology, psychology, or psychiatry, to name some of the specialists who would address the above impairments.

Dr. Kahl prescribed anxiety medication for Claimant and has taken over prescribing pain medications from Dakota Dunes Pain Clinic. (AR at 597, 600.)

Although Dr. Kahl has prescribed some anti-anxiety and weight-loss medications for Claimant (*Id.* at 597), she is not a specialist in the areas listed above. According to the American Medical Association, family medicine specialists are certified to provide the following services: "In addition to diagnosing and treating illness, they also provide preventive care, including routine checkups, health risk assessments, immunization and screening tests, and personalized counseling on maintaining a healthy lifestyle. Family physicians also manage chronic illness, often coordinating care provided by other subspecialists." Am. Med. Ass'n., Family Medicine, *Specialty Overview*, https://www.ama-assn.org/specialty/family-medicine. Accordingly, I find that this factor weighs in favor of affording the opinion little weight.

### f. Conclusion

After analyzing the foregoing five factors, I find that the ALJ conducted a proper analysis of Dr. Kahl's opinion and all the medical and non-medical evidence in the record and that substantial evidence on the record as a whole supports the ALJ's decision. Therefore, I recommend that the District Court affirm the ALJ's decision on this issue.

### B. The ALJ properly concluded the evidence did not support Claimant's subjective complaints and Claimant had the opportunity to present her best disability case.

Claimant argues that the ALJ improperly "rejected" her testimony even though it was "consistent with those of doctors Wisco, Espiritu, Johnson, Kovar, and Kahl." (Doc. 12 at 6.) Claimant also avers that the ALJ rejected the third-party statement of her husband, Douglas Olson, without making specific credibility findings. Lastly, Claimant

contends that the ALJ rejected her testimony in part, because "of an isolated statement in the medical records." [12]

The ALJ found that Claimant's statements were "simply not consistent with the preponderance of the opinions and observations by medical doctors in this case." (AR at 22.) The ALJ further found that Claimant's daily activities, the good symptom relief provided by her medications, and routinely normal examination findings undermined Claimant's allegations regarding her impairments. (*Id.* at 22-23.)

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective

---

[12] Claimant does not object to any other of the ALJ's findings related to her subjective complaints and credibility. Accordingly, Claimant has waived any other arguments related to her subjective complaints and credibility. *See Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010) (noting that district court opined that although the claimant "discussed the Record at some length, he has not alleged any of the ALJ's findings regarding his physical capabilities or the effects of depression were erroneous" and holding that any arguments not properly raised at the district court level are waived on appeal) (citing *Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Novotny v. Chater*, 72 F.3d 669, 670 (8th Cir.1995)); *see also Aulston v. Astrue*, 277 F. App'x 663, 664-65, 2008 WL 2066019 (8th Cir. 2008) (declining to address underdeveloped argument) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases for proposition that undeveloped arguments are waived).

complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[13] An ALJ is not required to "methodically" discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id*. § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

In this case, the ALJ found at the first step that Claimant had medically determinable impairments that could reasonably be expected to cause her alleged symptoms. (AR at 22.) At the second step, the ALJ found that "[C]laimant's statements concerning the intensity, persistence, and limiting effects of [her] symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." (*Id.*) To support this determination, the ALJ noted

---

[13] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v), (vi).

Claimant described daily activities "which are not as limited as one would expect, given the complaints of disabling symptoms and limitations." (*Id.* at 23.) The ALJ cited Claimant's ability to take care of her own hygiene needs, trips to the tanning salon, continued ability to care for her home and prepare meals, drive, shop, visit with friends four-to-five times a week, swim, fish, play with her grandson, and her continued ability to pay attention "all the time," and follow written and spoken instructions. (*Id.* at 16, 23.) The ALJ also noted that the medical records documented good symptom control on medications and acknowledged that while Claimant has received treatment for her alleged health issues, "the medical findings fail to support [her] allegation that she is unable to work." (*Id.*)

"The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004). "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to its judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (citation omitted). Here, "[a]lthough the ALJ did not go through a step-by-step factors analysis, he did discuss the facts relevant to a proper inquiry into each of the factors." *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011).

1. **The ALJ properly acknowledged and examined the objective medical evidence.**

When considering the objective medical evidence in the record, the ALJ recognized that "the medically determinable impairments could reasonably be expected to cause some but not all of the alleged symptoms and severity." (AR at 22.) The ALJ also noted, however, that Claimant's statements concerning "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical

evidence."[14]  (*Id.*)  The ALJ concluded that objective imaging did not support Claimant's "allegations of disabling symptoms and limitations."  (*Id.* at 17.)  In addition, the ALJ discussed the objective medical evidence in the record and explained, oftentimes document-by-document, why it did not support Claimant's allegations.  (*Id.* at 17-22.) Specifically, the ALJ noted that Claimant's medical examinations have been mostly within normal limits.  (*Id.* at 17-23.)  The ALJ also noted that Claimant did not participate in physical therapy when it was offered and that she does not stretch or exercise.  (*Id.* at 17.)  *See Guilliams*, 393 F.3d at 802 (citing *Gowell v. Apfel*, 242 F.3d 793, 797 (8th Cir. 2001)) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility.").

Regarding the treatment notes of Doctors Wisco, Espiritu, Johnson, and Kovar, and the opinion of Dr. Kahl, I make the following findings.  First, I find that Claimant has not stated what parts of the several physicians' treatment notes and Dr. Kahl's opinion allegedly required the ALJ to adopt her subjective complaints and therefore I will not address the arguments, other than to refer to the previous information and analysis already provided in this Report and Recommendation.  *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting "out of hand" a claimant's assertions because the claimant provided "no analysis of the relevant law or facts"); *Scott v. Astrue*, No. CIV. 5:07-CV-05168, 2008 WL 4183396, at *7 (W.D. Ark. Sept. 11, 2008) ("Because Plaintiff has not provided any briefing to support her claim, this Court is not required to address this argument.") (citing *Vandenboom*, 421 F.3d at 750); *Adams v. Astrue*, No. CIV. 4:07-CV-04030, 2007 WL 4557803, at *4 (W.D. Ark. Dec. 20, 2007) ("[B]ecause Plaintiff provided no facts or law to support these arguments and has provided this court

_____

[14] Although neither party makes arguments related to factors 2, 3, 4, and 5, I find that the ALJ properly acknowledged and examined evidence related to those factors before discounting Claimant's subjective complaints.  *See Lowe*, 226 F.3d at 972.

with no basis from which to analyze his claims, this Court is not required to address, and will not address, these three arguments directly in this opinion."); *see also Enslein ex rel Xurex, Inc. v. Di Mase*, No. 16-09020-CV-W-ODS, 2019 WL 2505052, at *31 (W.D. Mo. June 17, 2019) ("This Court 'is not required to speculate on which portion of the record' McKeon relies, 'nor is it obligated to wade through and search the entire record for some specific facts' supporting McKeon's arguments.") (quoting *White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990)).

Second, I find that the ALJ did not reject Dr. Wisco's treatment note. (*Id.* at 17.) Dr. Wisco diagnosed Claimant with carpal tunnel syndrome in both hands and "problems . . . related to fibromyalgia." (AR at 317.) As discussed above, the ALJ found that both of these impairments were severe. (*Id.* at 12.) Similarly, I also find that the ALJ did not reject Dr. Espiritu's treatment notes. As discussed above, Dr. Espiritu's treatment notes document office visits for "exaggerated pain response" that may be the result of a "pain syndrome" and carpal tunnel syndrome treatment. (*Id.* at 308, 314, 325.) His notes also document Claimant's carpal tunnel release surgeries. (*Id.* at 327-31.) The ALJ did not reject the fact that Claimant sought out a diagnosis for her "exaggerated pain response" or that she had carpal tunnel release surgery. To the extent that Claimant argues that the existence of fibromyalgia and a history of carpal tunnel syndrome qualify as severe impairments, the ALJ adopted those conclusions. (*Id.* at 12.) Accordingly, I find that the ALJ properly considered Dr. Wisco's and Dr. Espiritu's treatment notes when considering the objective medical evidence as it related to Claimant's subjective complaints. I further find, however, that the mere acknowledgment of the presence of fibromyalgia and carpal tunnel syndrome does not support Claimant's arguments related to her subjective complaints.

Third, I further find that the ALJ properly considered Dr. Johnson's treatment notes when evaluating the objective medical evidence in the record. Dr. Johnson saw

Claimant for medication checks and injections. (AR at 508-09, 513-16, 540-43, 553-54.) His treatment notes document that Claimant was experiencing good results with her medication, had mostly normal examination results, and was not in acute distress. (*Id.* at 508, 513, 553-54.) The ALJ discussed Dr. Johnson's notes at AR 18 and, while she did not discuss every appointment note, that is not fatal. *Wildman*, 596 F.3d at 966 (holding that "an ALJ is not required to discuss every piece of evidence submitted") (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)); *Holmes v. Astrue*, No. C10-2042, 2011 WL 2580333, at *11 (N.D. Iowa June 28, 2011) (same). The ALJ sufficiently conveyed information contained in Dr. Johnson's notes: that after some trial and error, Claimant was experiencing good results with her medications and that Claimant's examination results were mostly normal. Accordingly, in her assessment of the objective medical evidence, the ALJ properly considered Dr. Johnson's treatment notes as required.

Fourth, the ALJ properly considered Dr. Kovar's treatment note when evaluating the objective medical evidence in the record. The ALJ recited Dr. Kovar's findings from her one interaction with Claimant at AR 19. I found this to be a fair recitation of that interaction. As discussed above, the ALJ agreed with Dr. Kovar that Claimant has fibromyalgia and obesity. Claimant cites nothing in Dr. Kovar's treatment note that required the ALJ to adopt something in the note that the ALJ did not acknowledge. Therefore, I find that the ALJ properly considered Dr. Kovar's treatment note as required.

Finally, the ALJ properly considered Dr. Kahl's opinion. (AR at 22.) I find that the ALJ properly considered Dr. Kahl's opinion as it related to her subjective complaints. Specifically, the ALJ found Dr. Kahl's opinion was not supported by objective medical findings and was inconsistent with substantial evidence in the record. (AR at 22.) I find that the ALJ properly weighed this evidence.

In conclusion, I find that the ALJ properly considered the objective medical evidence in the record as it related to Claimant's subjective complaints.

**2.** ***The ALJ properly acknowledged and examined Claimant's Daily Activities.***

The ALJ also reviewed Claimant's daily activities to evaluate her subjective complaints. The ALJ noted that Claimant has the ability to interact socially, socialize with family four-to-five-times a week, go to the tanning salon, shop once per week, drive, and go out alone. (AR at 13.) The ALJ also noted that Claimant stated that she gets her son ready for school; completes light cleaning; walks; watches television; and maintains her own personal care, including dressing, bathing, caring for her hair, shaving, and toileting. (*Id.* at 14.) The ALJ also stated that Claimant prepares meals for her family, washes laundry, cleans the house, swims, fishes, and hunts. (*Id.* at 14, 23.) The ALJ supported all these findings with citations to the record, including citations to Claimant's function reports, and concluded that the ability to engage in these activities was not in concert with a finding of disability. I find that the ALJ properly acknowledged and examined Claimant's daily activities.

**a.** ***The ALJ properly concluded that Mr. Olson's third-party function report could not be given significant weight.***

Claimant's husband, Douglas Olson, completed two third-party function reports that basically state the same things Claimant's function reports state. (AR 205-12, 230-37.) Mr. Olson's reports state that Claimant can walk short distances and is unable to squat, bend, or kneel. They also state that Claimant can prepare simple daily meals; take care of her own hygiene; do light housework and laundry; shop if she has help carrying her groceries; visit with friends; swim and fish, although those activities have been cut back some since the onset of her symptoms; and that Claimant has no problems understanding or following instructions. (*Id.*) The ALJ did not give these reports significant weight because the ALJ found that they did not "establish that the claimant is

disabled." (*Id.* at 21.) The ALJ found that because Mr. Olson is not medically trained, his observations regarding Claimant's medical issues were "questionable." (*Id.*) Moreover, the ALJ found that Mr. Olson's natural affection for his wife might have "colored" his opinion and resulted in a "natural tendency to agree with the symptoms and limitations the claimant alleges." (*Id.* at 22.) The ALJ concluded, "Most importantly, significant weight cannot be given to Mr. Olson's statements because they, like the claimant's, are simply not consistent with the preponderance of the opinions and observations by the medical doctors in this case." (*Id.*)

Claimant argues that the ALJ rejected Mr. Olson's statements "without making specific credibility findings, other than stating that he was not a medically trained person and statements were questionable because the mere [sic] fact that he was her husband." (Doc. 12 at 7.) Claimant does not state what part of Mr. Olson's report the ALJ should have adopted or cite any law or facts that support this argument. Therefore, this argument could be "rejected out of hand" because Claimant has provided "no analysis of the relevant law or facts" to support her assertion. *See Vandenboom*, 421 F.3d at 750. However, because the argument is easily dispatched, I will do so.

I find that the ALJ properly evaluated the credibility of Mr. Olson's report by discounting his lack of medical expertise and because his statements were inconsistent with the medical evidence in the case. *See Young v. Apfel*, 221 F.3d 1065, 1068-69 (8th Cir. 2000) (affirming ALJ's decision to discredit third-party statements because they were not medical evidence and because the statements "were devoid of specific information that could contradict the medical evidence regarding [the claimant's] capabilities during the relevant time period").

Moreover, Mr. Olson's two third-party function reports are remarkably similar to Claimant's function reports signed on the same dates. (*Compare* AR 204-12 with 218-26; 228-37 with 252-59.) The ALJ found Claimant to be not credible regarding her

subjective complaints. Specifically, with regard to Claimant's activities of daily living, the ALJ cited Claimant's function reports, among other evidence in the administrative record, as evidence of Claimant's ability to function above her claimed level of ability. This situation is somewhat similar to the situation in *Young* in which the ALJ did not provide reasons for discrediting the testimony of the claimant's husband, who testified at the claimant's administrative hearing. 221 F.3d at 1068. *Young* held that when the evidence that the ALJ relied on for discrediting the testimony of the claimant was the same evidence that would have supported discrediting the testimony of her husband, the ALJ's failure to give specific reasons for discrediting his testimony was "inconsequential." *Id.; see also Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001) (holding that letter from claimant's daughter that "essentially restate[d] the claims of pain" made by claimant was properly rejected) (citation omitted). Although here, the ALJ *did* give specific reasons for discrediting Mr. Olson's report, including that it was inconsistent with the medical evidence (AR 22), I find that the same evidence the ALJ found supported finding Claimant not credible regarding her subjective complaints was also the same evidence that would have supported finding Mr. Olson's reports not credible, especially given that his reports are almost identical to Claimant's reports.

In conclusion, I find that the ALJ properly concluded that Mr. Olson's third-party function report could not be given significant weight.

> **b.      The ALJ did not misstate the facts in her conclusion and Claimant had the opportunity to present her best disability case.**

The ALJ cited hunting as one of the activities that Claimant engages in. (*Id.* at 23.) The ALJ noted that on November 20, 2013, "Claimant was seen [by PA Fernando] reporting her hope to go deer hunting with her husband soon, and indicating that her medications were helpful controlling her symptoms." (*Id.* at 18.) Claimant describes

this statement as "an isolated misstatement of facts contained in the medical records." (Doc. 14 at 3.)  Claimant asserts the following with regard to the hunting comment:

> This was never asked [about] or addressed by the ALJ at the hearing and somehow makes it sound like she was actually going hunting as opposed to going on an out of town trip with her husband, who was going deer hunting. The ALJ relies upon an isolated statement in an office note without asking the Claimant for details. It was over 4 years ago, a misstatement of the facts, and used to erode the treatment by the doctor for her fibromyalgia and back pain.

(Doc. 12 at 6.)

First, the ALJD did not misstate the facts.  Claimant was seen by PA Fernando on November 30, 2013.  (AR at 525.)  The treatment note states that "[s]he also tells me she is hoping to go hunting with her husband for deer. I advised her this may aggravate her back symptoms and if she does this she needs to be very careful.  My recommendation is strict observation but she will have to deal with the consequences if she aggravates her back. She verbalized understanding."  (*Id.*)  There is no evidence in the record that Claimant intended to do anything other than hunt.  PA Fernando's concerns seem more likely related to hunting than merely to a trip with Claimant's husband.

Second, the ALJ was not required to ask Claimant about one treatment note in an over-600-page administrative record.  The ALJ was the neutral decision-maker, not an advocate.  *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (citing *Clark v. Shalala*, 28 F.3d 828, 830–31 (8th Cir. 1994)).  Accordingly, the ALJ could not act as Claimant's attorney at the administrative hearing, especially when Claimant was represented by an attorney.  *Id.* (holding that ALJ could not act as advocate even when a claimant was *pro se* at a hearing).

Third, although "[a] disability claimant is entitled to a full and fair hearing under the Social Security Act," *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010), the claimant still has the burden to prove she is disabled.  *Moore*, 572 F.3d at 523.  "Where the ALJ's

determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations, the claimant has received a full and fair hearing." *Jones*, 619 F.3d at 969. The ALJ gave Claimant and her then-counsel the opportunity to prove she was disabled at the hearing on this matter. Claimant's attorney was allowed to make an opening statement and the ALJ asked relevant questions during the statement. (AR at 35-36.) After the ALJ questioned Claimant, Claimant's attorney had the opportunity to question Claimant. (*Id.* at 46-48.) Claimant's attorney was given the opportunity to question the VE, but declined to do so. (*Id.* at 51.) After the VE testified, the ALJ asked Claimant's attorney if the case was ready for decision and the attorney said, "It is, Your Honor." (*Id.*) Claimant's attorney chose not to give a closing statement and chose not to mention hunting. I find that the ALJ conducted a fair hearing and gave Claimant and her attorney the opportunity to be heard and to present all the evidence they wanted to present. Accordingly, the ALJ did not err in stating that Claimant went hunting since her alleged onset of disability date.

In conclusion, the ALJ did not misstate the facts in her decision, Claimant had a fair hearing, and Claimant had the opportunity to present her best case.

### c.    Conclusion on Daily Activities

Based on the above analysis of all the evidence the ALJ cited related to Claimant's daily activities, including Mr. Olson's reports and PA Fernando's treatment note stating that Claimant intended to go hunting, I find that the ALJ properly acknowledged and examined Claimant's daily activities.

### 3.  Conclusion

I find that the ALJ properly evaluated Claimant's subjective complaints and articulated good reasons for discrediting Claimant's testimony, self-reports, and Mr. Olson's report. *See Halverson*, 600 F.3d at 931 (holding that the court will "normally

defer to the ALJ's credibility determination" if the ALJ "explicitly discredits the claimant's testimony and gives good reasons for doing so").  Accordingly, I find that substantial evidence on the record as a whole supports the ALJ's credibility determination and recommend that the district court affirm the ALJ's decision on this issue.

## C.     *The ALJ did not rely upon a defective hypothetical.*

Claimant lastly argues that the ALJ relied upon a defective hypothetical.  The ALJ must assess the claimant's RFC and the demands of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 404.1520(a)(4)(iv).  If the claimant can still perform her past relevant work, the claimant is not disabled.  *Id.*  To assist in this determination, "a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work."  20 C.F.R. § 404.1560(b)(2).

"A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence."  *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) (quotation omitted).  "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true."  *Id.* "The hypothetical question must capture the concrete consequences of the claimant's deficiencies" but "may exclude any alleged impairments that [the ALJ] has properly rejected as untrue or unsubstantiated."  *Perkins*, 648 F.3d at 901-02 (quotations omitted).

At the hearing for this case, the ALJ posed one  hypothetical situation to the VE, Stephen Schill.  (AR at 50.)  The hypothetical assumed a person with the following RFC:

> [The] person could be able to be on their feet standing or walking two hours in an eight-hour day. Can sit for six hours in an eight-hour day.  Can occasionally do all postural activities, climb, balance, stoop, kneel, crouch, crawl.  Should not work on ladders or crawling on hands and knees, . . . .

Can use hands for frequent, not constant, handling, fingering and feeling. And then avoid concentrated exposure to cold, vibrating equipment, and fumes, but note that she is a cigarette smoker.

(*Id.*) The ALJ asked the VE to provide examples of appropriate sedentary work. (*Id.*) The VE testified that appropriate unskilled sedentary jobs for this person would be addresser, with 16,000 job in the national economy; document preparer, with 28,000 jobs in the national economy; and polisher of eye frames, with 19,000 jobs in the national economy. (*Id.*) The following exchange then took place between the ALJ and VE Schill.

ALJ: What is the source of the numbers, and is there any discrepancy between your testimony and the *Dictionary of Occupational Titles* in terms of jobs, exertion, or skill levels?

VE: My source is Department of Labor, Workforce Development, and there's no discrepancies.[15]

ALJ: And then how does this generally impact sedentary work if you can estimate?

VE: It's about 60 to 65%--

ALJ: Retained?

VE: --she would be retained.

---

[15] *Dictionary of Occupational Titles* is also a product of the Department of Labor. *See* U.S. Dept. Labor, *Dictionary of Occupational Titles* (4th rev. ed. 1991), https://www.oalj.dol.gov/LIBDOT.HTM. "The Dictionary of Occupational Titles (DOT) was created under the sponsorship by the Employment and Training Administration (ETA), and was last updated in 1991. The DOT was replaced by the O*Net, and ETA no longer supports the DOT. The O*Net is now the primary source of occupational information. It is sponsored by ETA through a grant to the North Carolina Department of Commerce. Thus, if you are looking for current occupational information you should use the O*Net." *Id.* The Social Security Administration is creating a new Occupational Information System to replace DOT that it intends to have operational by 2020. *Id.*

ALJ:  Okay. And these are some examples?

VE:    Yes, Your Honor.

(*Id.* at 51.)  Claimant's attorney declined to cross-examine VE Schill.  (*Id.*)

The ALJ concluded that Claimant is not capable of performing any of her past relevant work.  (*Id.* at 23.)  However, the ALJ also concluded that Claimant can perform other work that exists in significant numbers in the national economy.  (*Id.* at 24.) Specifically, the ALJ determined that Claimant can perform the jobs of addresser, with 16,000 jobs in the national economy; document preparer, with 28,000 jobs in the national economy; and polisher of eye frames, with 19,000 jobs in the national economy. (*Id.*)

Claimant alleges the ALJ relied upon a defective hypothetical, in part, because the hypothetical did not include the limitations articulated in Dr. Kahl's opinion that Claimant would "miss a lot of work" and Claimant's testimony that she "missed a lot of work because of her problems."  (Doc. 12 at 8.)  Claimant also argues that the ALJ "ignored the fact that the number of sedentary jobs was reduced to 60 to 65% of those available because of the variation use of hands from an ability to have constant handling, fingering and feeling to only being able to frequently handle, finger and feel.  This is set forth in the question to the VE and response from the VE."  (*Id.*) (emphasis omitted).

First, the ALJ properly evaluated Dr. Kahl's medical opinion and concluded the opinion should be afforded little weight as it was inconsistent with the record as a whole. Therefore, the ALJ was not required to include the properly rejected alleged impairments from Dr. Kahl's opinion in the hypothetical.  *See Prosch v. Apfel*, 201 F.3d 1010, 1015 (8th Cir. 2000) (holding that the ALJ was not required to include in the hypothetical impairments from a doctor's opinion that the ALJ properly rejected).  In addition, the ALJ also properly evaluated Claimant's credibility and found her to be not entirely

credible. The ALJ was only required to include in the hypothetical impairments the ALJ found supported by the record. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001).

The ALJ included in the hypothetical "all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit." *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001) (citation omitted). Therefore, the testimony of the VE constitutes substantial evidence and the ALJ did not rely upon a defective hypothetical. Accordingly, I recommend that the District Court affirm the ALJ's decision on this issue.

Second, contrary to what Claimant asserts, the VE did not testify that the number of jobs would be reduced based on hand-use limitations. The ALJ did not ask specifically about hand-use limitations at this point in the hearing, although the ability to only use hands frequently for fingering and feeling was included in the hypothetical. The Commissioner asserts that the VE "did not testify that the number of jobs he listed were reduced to 60 to 65% of available jobs, but rather that the sedentary occupational base was reduced to 60 to 65% of available jobs, giving further support for the conclusion that a significant number of occupations existed," presumably meaning that even more jobs were available to Claimant than estimated by the VE. (Doc. 13 at 12-13.) The Commissioner also asserts that even if the VE reduced the specific jobs he cited to 60 to 65% of those originally stated, that "would have left between 37,000 and 40,950 jobs in the national economy she could perform, [which]. . . would still be a significant number of jobs." (*Id.* at 13.) I agree that 37,000 to 40,950 is a significant number of jobs. *See Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014) (36,000 jobs in national economy is a significant number of jobs); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 addresser and document preparer jobs in the national economy was a significant number of jobs). Therefore, I also recommend that the District Court affirm the ALJ's decision on this issue.

In conclusion, I find that substantial evidence on the record as a whole supports the conclusion that the ALJ did not rely upon a defective hypothetical and recommend that the district court affirm the ALJ's decision on this issue.

## IV.    CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm the decision of the ALJ** and **dismiss Plaintiff's case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 18th day of July, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa